UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

TAMMY CHERIE PETRANOFF,

      Plaintiff,

   v.

NANCY A. BERRYHILL,

      Defendant.

Case No. 16-cv-07321-RMI

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 31, 32

      Plaintiff, Tammy Cherie Petranoff, seeks judicial review of an administrative law judge ("ALJ") decision denying her application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council. The ALJ's decision is therefore the "final decision" of the Commissioner of Social Security, which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (Docs. 6 & 11), and both parties have moved for summary judgment (Docs. 31 & 32). For the reasons stated below, the court will grant Plaintiff's motion for summary judgment, and will deny Defendant's motion for summary judgment.

## LEGAL STANDARDS

      The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## PROCEDURAL HISTORY

On July 24, 2012, Plaintiff filed applications for benefits under Titles II and XVI, alleging an onset date of July 16, 2012. (Doc. 16, Administrative Record "AR" at 19). The ALJ denied the applications on June 15, 2015 (AR at 31), and the Appeals Council denied Plaintiff's request for review on October 24, 2016 (AR at 1-5).

## SUMMARY OF THE RELEVANT EVIDENCE

Plaintiff suffers from the following impairments: morbid obesity, degenerative joint disease of both knees, right hip impingement, lumbar spine degenerative disc disease, left shoulder tendinopathy, and depression. (AR at 22). The ALJ determined that the all of Plaintiff's impairments were severe. (*Id*.).

### *Medical Opinions from Treating Physicians:*

In May of 2011, Plaintiff underwent MRI imaging of her knees at Humboldt Medical Specialists in Fortuna, California. (*Id*. at 465). One of her treating physicians, Ilan Kinori, M.D., noting a history of pain with limitation of motion in the right knee, undertook to assess the knee for "internal derangement." (*Id*.). Dr. Kinori found that the anterior horn and body of the lateral meniscus in Plaintiff's right knee were "displaced laterally with marked fraying and hydropic changes present in the anterior horn, representing an extensive complex tear." (*Id*. at 466). Dr. Kinori also found that Plaintiff suffered from extensive thinning of the articulating cartilage in the femororbital compartment of the knee, as well as stress-related degenerative changes to the joint, and small joint effusion with a 2.8 cm popliteal cyst. (*Id*.).

During a visit on March 31, 2013, another of Plaintiff's treating physicians, Ronald Jones,

United States District Court
Northern District of California

M.D., assessed her impairments as including knee joint pain, exogenous obesity, and internal derangement of the lateral meniscus – Plaintiff's height was measured at 5 foot 2 inches, and her weight was 305 pounds. (AR at 458-59). Dr. Jones had been treating Plaintiff since 2011 for knee pain "with evidence of some lateral compartment narrowing and obvious tearing of the lateral meniscus." (*Id*. at 458). Dr. Jones noted that Plaintiff was morbidly obese and that he "could not guarantee that with her weight [he] could relieve all of her pain, but it would be appropriate to consider arthroscopy of the knee to address the meniscus and to get a firsthand view of the condition of her lateral compartment." (*Id*. at 459). This particular visit had been initiated due to Plaintiff experiencing pain in both knees, as opposed to only the right knee; Dr. Jones noted that due to Plaintiff's morbid obesity, it was impossible to determine if there was any abnormal swelling around either of her knees. (*Id*.). He did, however, note that when Plaintiff walks, "she has obvious antalgia with a valgus collapse of the right knee and discomfort with any weight-bearing on it [and that] [t]he left knee is functioning a bit better, but [it] also demonstrates antalgia." (*Id*.). Dr. Jones warned Plaintiff (in 2013) that if she did not lose a substantial amount of weight, the consequence would be "severe and lasting problems with her knees," and Plaintiff was given a referral for bariatric surgery for weight loss. (*Id*.). Perhaps due to the interrelated nature of certain impairments, Dr. Jones had noted (in 2011), that "eliminating her knee pain would make weight loss easier for her." (*Id*. at 461).

Plaintiff was referred for bariatric surgery in 2011 and in 2013 (*see id*. at 459, 461, 459, 485, 521), however the only surgeon in her area performing this procedure would not accept Medi-Cal, and Plaintiff informed her treating physicians that she was financially unable to travel back and forth to the nearest such surgeon in Santa Rosa (from her home in Fortuna, California) for multiple evaluations. (*Id*. 485). Thus, Plaintiff was never able to consult with a bariatric surgeon due to financial limitations and lack of adequate health insurance.

Thereafter, on June 27, 2014, Plaintiff was treated for left-shoulder pain by Erik McGoldrick, M.D., who described her as morbidly obese and recorded her weight as having

increased to 335 pounds, yielding 61.27 as her BMI[1] number. (*Id.* at 524-25). Dr. McGoldrick's physical exam assessed a decreased range of motion in Plaintiff's left-shoulder with pain associated with elevation of her left arm. (*Id.* at 525). MRI imaging revealed the abnormal presence of "some bursal fluid in the subacromial space and some partial thickness changes to her rotator cuff tendons." (*Id.*). The assessment this time was that Plaintiff suffered from obesity, chronic scapular pain, and tight posterior capsule of the left shoulder. (*Id.*).

In February of 2015, Plaintiff's treating osteopath, Mark Roback, D.O., noted her treatment history under his care for chronic pain due to degenerative joint disease of the left knee and internal derangement of the left shoulder, adding that Plaintiff required the use of oral narcotic medication five times a day in order to reduce her pain level from 8-9 out of 10, to a 4-5 out of 10. (*Id.* at 530). During this visit Plaintiff told Dr. Roback that she finds that with better pain control, she is able to do some laundry and other light household chores, but that she is still unable to walk any appreciable distance due to persistent knee pain. (*Id.* at 529). Plaintiff's weight was measured as having increased to 353 pounds, yielding a BMI of 64.68. (*Id.* at 530).

As early as 2013, Dr. Roback had noted that Plaintiff's advanced bilateral osteoarthritis of the knees would require total knee arthroplasty; in the absence of which, she would be unable to sit for more than 1 hour at a time, and could stand for no more than 15 minute intervals. (*Id.* at 471). In May of 2015, Dr. Roback noted that Plaintiff's weight had increased to 359 pounds, noting that she was not a candidate for a knee arthroplasty due to her weight, and that it appeared that pain management was the only treatment option for her knee problems. (*Id.* at 530-31). For the chronic pain, Dr. Roback instructed Plaintiff to take a 10 mg dose of hydrocodone every 4 hours. (*Id.*). Plaintiff's weight thereafter increased to 362 pounds in June of 2015, and her BMI was calculated at 66.27. (*Id.* at 533-34). In September of 2015, Dr. Roback opined that in an eight-hour workday: Plaintiff could frequently lift or carry up to 5 pounds; that she could occasionally carry or lift up to 10 pounds; that she could stand or walk up to two hours; and that she would not

---

[1] BMI is a height-weight ratio that is derived when a person's weight, in kilograms, is divided by the square of their height, in meters. Patients with BMI numbers rising above 30.0 are generally considered obese. *See Centers for Disease Control and Prevention – About Adult BMI*: https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/index.html

1  be able to alternate between sitting and standing due to her need to lie down or recline periodically

2  during the workday. (*Id*. at 529).

3  ***Medical Opinions from Non-Examining State Agency Physicians:***

4  In December of 2012, a state agency physician, T. Nguyen, M.D., reviewed Plaintiff's

5  medical records. (*Id*. at 81-91). As to Plaintiff's physical impairments, Dr. Nguyen noted that

6  "[t]he severity of her physical symptoms should be evaluated by the appropriate specialist." (*Id*. at

7  82). Dr. Nguyen also noted that a consultative examination would be required because "[t]he

8  evidence as a whole, both medical and non-medical, is not sufficient to support a decision on the

9  claim." (*Id*. at 84). Notwithstanding these notations, Dr. Nguyen somehow concluded that Plaintiff

10  could spend up to one-third of an eight-hour work day carrying or lifting 20 pounds; that she could

11  spend up to two-thirds of an eight-hour word day carrying or lifting 10 pounds; that she could

12  stand or walk for 6 hours per day; and that she could occasionally balance, stoop, kneel, crouch,

13  and crawl. (*Id*. at 88-89).

14  In October of 2013, another state agency physician, Alan Coleman, M.D., reviewed

15  Plaintiff's medical records. (*Id*. at 113-17). Dr. Coleman's assessment noted that the opinion of

16  Plaintiff's treating physician, Dr. Roback, which had assessed Plaintiff's functioning capacity as

17  highly limited, was disagreeable because "it provides no basis on exam or other findings for these

18  recommendations." (*Id*. at 113). Also, without any detail as to the reason for such a finding by a

19  non-examining physician, Dr. Coleman stated that, in his view, Plaintiff's complaints about her

20  symptoms were only "partially credible." (*Id*.). With the exception of a few minor differences, Dr.

21  Coleman's assessment of Plaintiff's functioning capacity was the same as what was opined by Dr.

22  Nguyen in 2012 (that Plaintiff could spend up to one-third of the work day carrying 20 pounds,

23  and so on). (*Id*. 113-114).

24  ***Lay Witness Testimony About Plaintiff's Functioning:***

25  On November 10, 2012, Plaintiff's housemate, Ms. Monica Hurley, executed a third party

26  "function report" on a form provided by the Commissioner. (*Id*. at 244-252). Ms. Hurley's

27  statement noted that she had known Plaintiff for six years, that they lived together, and that they

28  spend the majority of the day together, with Ms. Hurley helping Plaintiff with housework. (*Id*. at

244). Ms. Hurley added that Plaintiff could not sit, stand, or walk for long periods of time without needing frequent breaks, and that she would have trouble bending or carrying things. (*Id.* at 244-45). Ms. Hurley then stated that she helps Plaintiff with nearly all activities of her daily life such as care and feeding tasks for the dog, help with all indoor housework (while Ms. Hurley would do all outdoor housework by herself), as well as help preparing even simple meals. (*Id.* at 245-47). Ms. Hurley also noted that prior to the onset of these impairments, Plaintiff's would frequently go for short walks for exercise, ride the exercise bike, or cook more complicated meals. (*Id.* at 245). She also stated that Plaintiff has difficulty sleeping due to numbness or pain in her legs and back. (*Id.*). She added that while Plaintiff is able to prepare meals for herself, Plaintiff can only stand for long enough to prepare "tv-dinners, canned food (raviolis), soup, ramen noodles, mac & cheese, things that are easily microwaved," and that even then, Plaintiff still needed help with these tasks and would only undertake such cooking "once or twice a week now." (*Id.* at 246).

Ms. Hurley also noted that Plaintiff rarely goes outside because she tends to fall easily. (*Id.* at 247). When Plaintiff goes shopping, usually once a week, Ms. Hurley stated that "it seems to take most of the day." (*Id.*). Ms. Hurley had observed that Plaintiff's impairments affect her ability in the areas of lifting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and completing tasks. (*Id.* at 249). When asked how far Plaintiff could walk before needing to rest, Ms. Hurley stated 15 to 20 feet, and that the length of these rest intervals would depend on Plaintiff's level of pain. (*Id.*).

***Plaintiff's Testimony:***

More than two years after the date of Ms. Hurley's third-party function report, Plaintiff testified at a hearing before the ALJ. (*Id.* at 36-67). The hearing began with counsel noting that Ms. Hurley's declaration was also part of the record. (*Id.* at 40). Plaintiff testified that she had worked as a retail cashier from 1993 until 2007, from which point she became employed as a childcare worker until the alleged disability onset date in 2012. (*Id.* at 41). However, after 2012, Plaintiff continued babysitting four children, in two-child shifts. (*Id.* at 41-44). Plaintiff noted that her housemate, Ms. Hurley, is present at all times and in fact performs nearly all of the childcare tasks. (*Id.* at 45-46). While a state agency pays Plaintiff (and Ms. Hurley) a few hundred dollars

per month for the childcare services, nearly the entirety of that sum is consumed by the payment of expenses such as the children's food, art supplies, and toys. (*Id*. at 46-47, 50-51). Plaintiff testified that on an average day, her routine involves babysitting one pair of children during the day, and another pair during the evening, with Ms. Hurley doing all the work preparing the children's meals, changing diapers, and watching them while they play outside; all the while, Plaintiff testified, "I sit in my chair and recline . . . I get up throughout the day to go to the bathroom . . . That's pretty much what I do, sit in a chair." (*Id*. at 48-49, 65-66).

Plaintiff also testified that the reason she stopped working in 2012, was that her employment at a childcare center was terminated when her employer told her that "she thought it was best . . . that I go ahead and go on disability . . . [because] I could not do the job like I needed to anymore." (*Id*. at 52-53). Plaintiff described the pain in her right knee as a burning sensation that existed 100 percent of the time, and that it felt like, "they've got a chisel in there chiseling it." (*Id*. at 53). Plaintiff related that she had been told that she needed knee replacement surgery, but that because a knee replacement only lasts for 10 years, Dr. Jones had told her he was reluctant to do it because of both her relative youth and her weight. (*Id*. at 54). Although she had been referred for bariatric surgery for weight loss, Plaintiff testified that she was never able to undergo the procedure because no surgeon in her area would accept Medi-Cal, and because she did not have the financial resources to travel to San Jose or San Francisco for multiple evaluations and follow-ups. (*Id*.). The ALJ asked Plaintiff if she had tried losing weight; Plaintiff responded that she had indeed tried, but that she could not exercise, and that this causes her to "get real depressed, it just doesn't seem like I can lose weight." (*Id*. at 55). Plaintiff was then asked to report her weight and height; she responded that her height was 5'2" and she weighed 348 pounds. (*Id*.).

Plaintiff was also asked about her left knee, which she reported as having progressively worsened over the preceding two years due to the left knee bearing more than its share of her weight, because of her right-knee impairments. (*Id*. at 55-56). Plaintiff also described her lower back pain as persisting, "all the time," and involving "a burning" sensation. (*Id*. at 56). Plaintiff testified to the daily use of the following medications: four to five doses of oral narcotics and ibuprofen, muscle relaxants, high blood pressure medication, thyroid medicine, anti-anxiety

medication, and medication for restless leg syndrome. (*Id*. at 56-58). Plaintiff added that, in addition to not being able to sleep well at night because of pain and restless leg syndrome, during the day she experiences a pervasive feeling of sleepiness due to her narcotic medications. (*Id*. at 59, 63).

Plaintiff then testified that she could not lift her arm above her head, and that her shoulder was painful 90 percent of the time, requiring the use of "three or four bottles of Icy/Hot a month." (*Id*. at 59). Additionally, as a result of a history of falling, Plaintiff ambulates with the assistance of a cane "about 85 to 95 percent of the time." (*Id*. at 60). She testified that after sitting for as little as 10 minutes, her pain becomes unbearable, and that her pain is significantly less if she is in a fully reclined position, a state she occupies for nearly the entirety of each day. (*Id*. at 61-62). She then related that after standing for as little as 5 or 10 minutes, her "knee just kind of locks up [] and I just go blah." (*Id*. at 63). When asked how much she could lift, Plaintiff opined that she might be able to lift five pounds." (*Id*.). Plaintiff also related that while she can generally take care of herself most of the time, sometimes Ms. Hurley has to help her with getting dressed. (*Id*. 64). She added that even though she spends nearly the entirety of her days in her reclining chair so as to mitigate the possibility of her falling and injuring herself due to the frequent buckling of her knees, nevertheless, Plaintiff still falls "once or twice" each month. (*Id*. 66-67).

**THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY**

A person filing a claim for social security disability benefits ("the claimant") must show that she has the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[2] The ALJ must consider all evidence in the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-step sequential evaluation process to determine whether the claimant is disabled (*see id*. § 416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that

---

[2] The regulations for supplemental security income (Title XVI) and disability insurance benefits (Title II) are virtually identical though found in different sections of the CFR. For the sake of convenience, the court will generally cite to the SSI regulations herein unless noted otherwise.

the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

Here, the ALJ evaluated Plaintiff's application for benefits under the required five-step sequential evaluation. (*See* AR at 20-31).

At Step One, the claimant bears the burden of showing she has not been engaged in "substantial gainful activity" since the alleged date the claimant became disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. (AR at 21).

At Step Two, the claimant bears the burden of showing that she has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). The ALJ found that Plaintiff suffered from the following severe impairments: morbid obesity, degenerative joint disease in both knees, right hip impingement, lumbar spine degenerative disc disease, left shoulder tendinopathy, and depression. (AR at 22).

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the burden of showing her impairments meet or equal an impairment in the listing. *Id*. If the claimant is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four. *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (AR at 22-25). Next, the ALJ determined that Plaintiff retained the RFC "to perform sedentary work" with a number of exceptions and certain physical limitations. (AR at 25-29).

At Step Four, the ALJ determined that Plaintiff is unable to perform any past relevant work. (AR at 29-30).

At Step Five, the ALJ concluded that based on the testimony of the vocational expert, and

9

the ALJ's formulation of the RFC, that Plaintiff was capable of making a successful adjustment to work that existed in significant numbers in the national economy (such as document preparer, call-out operator, and order clerk); and thus, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from July 16, 2012, through the date of the decision. (AR at 30-31).

## ISSUESS PRESENTED

Plaintiff presents four interrelated issues for review, contending that the ALJ's decision was flawed because the ALJ: (1) failed to adequately consider Plaintiff's obesity; (2) formulated a RFC that is unsupported by substantial evidence; (3) improperly rejected the opinion of Plaintiff's treating physician; and, (4) improperly rejected lay witness testimony.

## DISCUSSION

### *Step Three Errors:*

Plaintiff's first issue takes exception with the ALJ's consideration of her obesity. Pl.'s Mot. (Doc. 31) at 4-6. Plaintiff points out that the ALJ understated her BMI – by characterizing it as simply "over 50," rather than stating it accurately as 64.60. *Id*. at 4. More importantly, Plaintiff takes issue with the ALJ's consideration of obesity at Step Three as well as in the formulation of the RFC. *Id*. at 5-6. The Commissioner responds only by asserting that "the ALJ did discuss Plaintiff's obesity and how it exacerbates her knee and back impairments," and that the discussion was sufficient. Def.'s Mot. (Doc. 32) at 1-2.

As mentioned, at Step Two, the ALJ found that Plaintiff suffered from depression as well as several severe physical impairments: degenerative joint disease in both knees, right hip impingement, lumbar spine degenerative disc disease, left shoulder tendinopathy, and morbid obesity. (AR at 22). At Step Three, the ALJ purported to determine that no *combination* of these impairments met *or equaled the severity* of any impairment listed in Appendix 1 of 20 C.F.R., Part 404, Subpart P. (AR at 22). However, the ALJ's analysis at Step Three fell short of what the law requires.

At Step Three, even if a claimant's single impairment does not meet the criteria specified in a particular listing, a disability must nevertheless be found if the claimant's overall condition "is

10

equal to" a listed impairment. 20 C.F.R. § 404.1520(d). When evaluating a claimant with more than one impairment, the Commissioner must consider "whether the combination of [] impairments is medically equal to any listed impairment." 20 C.F.R. § 404.1526(a). Thus, a claimant's illnesses "must be considered in combination and must not be fragmentized in evaluating their effects." *Beecher v. Heckler*, 756 F.2d 693, 694-95 (9th Cir. 1985). In determining whether the severity of a combination of impairments equals a particular listing, the Commissioner must consider whether the "symptoms, signs, and laboratory findings are at least equal in severity to the listed criteria." 20 C.F.R. § 404.1529(d)(3); *see also*, *Lester v. Chater*, 81 F.3d 821, 829 (9th Cir. 1995); *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990) (where a claimant presents evidence that a combination of impairments equals a listing, the ALJ must make findings sufficient to show that the ALJ actually considered equivalence).

Regarding Plaintiff's physical impairments, the ALJ correctly identified Listing 1.02 (major dysfunction of a joint)[3] and Listing 1.04 (disorders of the spine)[4] as pertinent. (AR at 22). As illustrated below, however, the ALJ committed several legal errors at Step Three in evaluating

---

[3] Listing 1.02 requires dysfunction of one or more joints attended with gross anatomical deformity, chronic pain, stiffness, and limitation of motion or other abnormal motion; and, it must also be attended with either joint space narrowing, bony destruction, or ankylosis of the affected joint. Additionally, this must either involve a major peripheral joint, resulting in the inability to ambulate effectively, or the inability to perform fine and gross movements effectively. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.02. Furthermore, "ineffective ambulation" is defined in Listing 1.00 as an extreme limitation of the ability to walk; insufficient lower extremity functioning [] to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. To ambulate effectively, on the other hand, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living, such as the ability to travel without companion assistance to and from a place of employment – examples of "ineffective ambulation" include the inability to walk a block at a reasonable pace on rough or uneven surfaces, or the inability to climb a few steps at a reasonable pace with the use of a single hand rail. *See id.* at § 1.00(B)(2)(b).

[4] Listing 1.04 Requires a spinal disorder resulting in compromise of a nerve root or the spinal cord. This must be attended with any of the following: (a) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); (b) spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or, (c) lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in an inability to ambulate effectively. *See id.* at § 1.04.

Plaintiff's condition under these listings. First, the ALJ failed to consider each of Plaintiff's applicable physical impairments in evaluating whether the standard described in Listing 1.02 was actually met. Second, the ALJ did not consider Plaintiff's overall condition to determine if its severity was equal to those specified in both Listings 1.02 and 1.04, thus improperly fragmentizing Plaintiff's overall condition at Step Three.

The ALJ's analysis of Listing 1.02 was limited to 4 sentences and *only* focused on the fact that Plaintiff's use of a cane did not limit the functioning in both of her upper extremities, as would be the case with crutches or a walker, that Plaintiff can walk as far as 50 yards, and that she can complete some household chores. (AR at 22). Notably, the ALJ concludes that "[t]he evidence indicates to the undersigned that the claimant's ***impairment*** does not satisfy the criteria of listing 1.02A." (*Id.*) (emphasis added). The ALJ did not specify *which* "impairment" (singular) was being considered under Listing 1.02. Therefore, it is unclear whether the ALJ was unpersuaded that Listing 1.02's requirements were met by Plaintiff's degenerative joint disease in both knees, or the impingement in her right hip. Both impairments were found severe at Step Two, however, at Step Three, under Listing 1.02, the ALJ merely noted that "claimant's impairment" did not satisfy the requirements of the listing. This was legal error; the ALJ's Step Three analysis was required to begin with an evaluation of *each* of Plaintiff's applicable conditions under the listing.

The ALJ also erred at Step Three by fragmentizing Plaintiff's impairments and failing to consider whether her overall condition (that is, the combined effect of her several impairments) was such as to be equal in severity to the requirements of either Listings 1.02 or 1.04. When evaluating each listing, the ALJ merely concluded that "the undersigned does not find that the requirements for [the] listing [] are met." (AR at 22, 23). The ALJ decision contained no analysis, or any other mention, as to whether the combined effects of Plaintiff's impairments are equal in severity to those specified in Listings 1.02 and 1.04. Compounding these errors, the ALJ also failed to evaluate the effect of Plaintiff's morbid obesity in combination with her Listing 1.02 and Listing 1.04 impairments, because of the notion that "[n]o medical source [had] opined that the claimant's obesity exacerbated her other impairments to the point that she met or medically equaled a listing." (AR at 23). First, it was the ALJ's responsibility (and not that of a physician) to

evaluate the severity of Plaintiff's combined impairments (including her obesity) such as to determine whether there was an equivalency with a listing. Second, the ALJ also appears to have considered obesity in a similarly fragmentized and isolated fashion, noting that "the undersigned does not find that the claimant's obesity meets or equals a listing." (AR at 23). Third, and in any event, Plaintiff's treating orthopedic specialist, Dr. Jones, had in fact opined that Plaintiff's knee, hip, and back conditions were exacerbated by her obesity. (AR at 459-61). Dr. Jones had warned Plaintiff that if she did not lose a substantial amount of weight, the consequence would be "severe and lasting problems with her knees." (*Id.* at 461). Illustrating the 'catch-22' of Plaintiff's combined impairments, Dr. Jones also noted that "eliminating her knee pain would make weight loss easier for her." (*Id.*).

Lastly, the ALJ appears to have also taken an unduly narrow view of the definition of "effective ambulation," specified in 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00(B)(2)(b). In finding that Plaintiff's "impairment" does not satisfy Listing 1.02's requirements, the ALJ relied on the fact that Plaintiff's use of a cane does not incapacitate both of her arms. (AR at 22). However, a review of the definition of "effective ambulation" in § 1.00(B)(2)(b), reveals that it requires sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living, such as the ability to travel without companion assistance to and from a place of employment, and that "ineffective ambulation" includes the inability to walk a block at a reasonable pace on rough or uneven surfaces, or the inability to climb a few steps at a reasonable pace with the use of a single hand rail. *See id*. Consequently, it was also error for the ALJ to focus on the only specification, among many, in § 1.00(B)(2)(b)'s "effective ambulation" definition that did not cover Plaintiff's circumstances, while ignoring those which did.

Having found a number of errors at Step Three, the court must now decide whether remand for further proceedings is appropriate. Plaintiff requests that the court enter a finding of disability and order the calculation and payment of appropriate benefits on remand under the credit-as-true rule. Pl.'s Mot. (Doc. 31) at 11. The Commissioner argues, *inter alia*, that remand for further proceedings is more appropriate than a reversal with an award of benefits under the circumstances. Def.'s Mot. (Doc. 32) at 7.

It is well established that "[i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded [for further proceedings]." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981). On the other hand, a district court may modify or reverse a decision by the Commissioner, "with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see also Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014). Generally, remand with instructions to award benefits has been considered when it is clear from the record that a claimant is entitled to benefits. *Id.* The credit-as-true doctrine provides that when "there are no outstanding issues that must be resolved before a proper disability determination can be made, and where it is clear from the administrative record that the ALJ would be required to award benefits if the claimant's excess pain testimony were credited, we will not remand solely to allow the ALJ to make specific findings regarding that testimony . . . [instead] we will . . . take that testimony to be established as true." *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1401 (9th Cir. 1988) ("*Varney II*").

In the instant case, it can not be said that there are no outstanding issues that must be resolved before a proper disability determination can be made. Specifically, because the requirements under Listings 1.02 and 1.04 are detailed and technical, this court is of the opinion that the matter could benefit from further record development. For example, while the ALJ focused the Listing 1.02 analysis on only one of the example definitions of "effective ambulation," found in 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00(B)(2)(b), this court notes that the record of the hearing before the ALJ leaves much to be desired regarding Plaintiff's ambulatory abilities and limitations when they are viewed from within the framework of the definitions found in § 1.00(B)(2)(b). Thus, remand for further proceedings is more appropriate because the court does not view the record as "fully developed" in this case. Additionally, because of the above-described procedural errors at Step Three, necessitating a near-total reengagement of the sequential evaluation process from Step Three forward, the court can not conclude that no useful purpose would be served by further administrative proceedings. Accordingly, the matter will be remanded for further proceedings consistent with this order. On remand, the Commissioner is instructed to ensure that the record is fully and properly developed by, for example, conducting a second

14

hearing at which inquiries should be made regarding Plaintiff's condition in light of the various definitions of terms such as "effective ambulation," as well as any other key terms pertinent to Listings 1.02 and 1.04. *See Brown*, 713 F.2d at 443 ("[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered.").

### *Improper Weighing of Evidence in Formulating the RFC:*

Plaintiff also alleges that the RFC was unsupported by substantial evidence because the ALJ improperly rejected the opinions of Plaintiff's treating physicians, Plaintiff's own testimony, and the testimony of a lay witness as to Plaintiff's functioning capacity. Pl.'s Mot. (Doc. 31) at 5-10. Defendant responds that the ALJ's reasoning for discounting medical opinion evidence and testimony regarding the degree of Plaintiff's limitations was sound. Def.'s Mot. (Doc. 32) at 3-6. Defendant further submits that the ALJ's weighing of the evidence can be justified by the fact that Plaintiff, "albeit with assistance from her friend," cares for two children at a time in her home; and also because Plaintiff's testimony about spending most of the day in a reclined posture is somehow inconsistent with her testimony about sometimes combing her daughter's hair, heating pre-cooked food, and occasionally doing light housework. *Id*. at 3. Alternatively, the Commissioner invites the court to "draw inferences as to why the ALJ rejected the more restrictive medical opinions and Plaintiff's subjective complaints in assessing her credibility." *Id*. at 6. As to the ALJ's treatment of Ms. Hurley's lay witness testimony about Plaintiff's functioning capacity, Defendant submits that "although it was inappropriate for the ALJ to discount Ms. Hurley's testimony because she was not an acceptable [medical] source, the ALJ also found [that] because her statements simply parroted those of Plaintiff[,] her statement was only entitled to limited weight." *Id*. at 6. The Commissioner's arguments are unpersuasive and, for the reasons that follow, the court finds that the RFC was not based on substantial evidence because the ALJ's decision either improperly weighed the evidence, or the decision failed to provide any clear or convincing justification for its chosen view of the evidence.

Without mincing words, the court will note that the evidentiary picture presented by the above-summarized and uncontroverted evidence in the record is one of a person who is much more likely disabled than not; and, that with a more poignantly-developed record and an error-free

Step Three evaluation, Plaintiff appears likely to be found disabled. The particularly unfortunate combination of morbid obesity and degenerative joint diseases in Plaintiff's knees and spine, as well as her hip impingement, interact with one another in such a manner as to each aggravate the other, as well as each seeming to make the other immune from remedy. Without substantial weight loss, doctors will not perform replacement surgeries for her knees. At the same time, as noted by her treating orthopedic specialist, Dr. Jones, she is unable to exercise or lose weight due to her knee impairments. She was referred for bariatric surgery, yet no surgeon in her area would accept Medi-Cal, and Plaintiff lacks the resources to travel to Santa Rosa or beyond. In any event, it appears that each of these impairments operates to progressively worsen the severity of the other. In arriving at a different conclusion, the ALJ noted, "the undersigned cannot make assumptions about the severity or functional effects of obesity combined with other impairments as such a combination may or may not increase the severity or functional limitations of the other impairment." (AR at 23). If, for example, the task was to evaluate the combined effects of obesity and sinusitis, such an assumption would indeed be improper; however, in the case of the interaction between morbid obesity and damaged knees (or any other weight-bearing joint), the court finds that the existence of gravity, and its direct relationship with mass (i.e., Newton's law of gravitation), is beyond doubt. Indeed, the ALJ's skepticism at Step Three appears to have disappeared during the formulation of the RFC, where the ALJ noted that, "[a]s the record indicates, the claimant's obesity exacerbates her knee and back impairments." (*Id*. at 27).

As discussed above, Plaintiff testified to working as a retail cashier between 1993 and 2007, after which she worked at a childcare center until 2012, when she was laid off and told to seek disability due to the progression of her impairments. (*Id.* at 41, 52-53). Since then, Plaintiff nominally babysits four children in two shifts, but where her housemate, Ms. Hurley, does nearly all of the actual work. (*Id*. at 41-46, 48-49, 65-66). Constant pain appears to be a fixture in Plaintiff's life, as she has been administered five strong doses of oral narcotics per day for years in order to only moderately reduce her pain, and which in turn makes her sleepy throughout the day. (*Id*. at 56-60). After sitting for as little as 10 minutes, or standing for as little as 5 minutes, her pain becomes unbearable. (*Id*. at 61-63). Although she can walk for only a few feet, and with the use of

16

a cane, before needing to rest, she still surmised that she may be able to lift up to 5 pounds; also, despite the fact that she spends most of her time in a reclined position, she still suffers a fall once or twice a month. (*Id*. at 61-67).

Plaintiff's testimony before the ALJ was consistent with both Ms. Hurley's declaration about Plaintiff's functioning capacity, as well as the functioning capacity opinion of Plaintiff's treating physician, Dr. Roback. Ms. Hurley had submitted that Plaintiff could not sit, stand, or walk for long periods of time without frequent breaks, and that she has trouble bending or carrying things. (*Id*. at 244-45). Ms. Hurley also related that she handles most of the household tasks and nearly all of the childcare tasks. (*Id*. at 245-49). She related that Plaintiff could perhaps walk as far as 15 or 20 feet before needing to rest, and that when Plaintiff would occasionally venture out for shopping, "it seems to take most of the day." (*Id*. at 247, 249). Dr. Roback, Plaintiff's longtime treating physician, had noted in 2013 that Plaintiff would be unable to sit for more than 1 hour at a time and stand for no more than 15 minute intervals. (*Id*. at 471). Two years later, in 2015, Dr. Roback opined that during a typical workday, Plaintiff could frequently lift up to 5 pounds, that she could occasionally lift up to 10 pounds, that she could stand or walk up to two hours, and that she would not be able to alternate between sitting and standing due to the requirement that she recline periodically during the workday. (*Id*. at 529).

State agency physicians, Drs. Nguyen and Coleman, who had never examined Plaintiff but had reviewed her medical records (in December of 2012 and October of 2013), concluded that Plaintiff could spend two or more hours per day carrying or lifting 20 pounds, up to four hours carrying or lifting 10 pounds, and that she could stand or walk for 6 hours per day, while occasionally balancing, stooping, kneeling, crouching, and crawling. (*Id*. at 88-91, 113-117).

The ALJ gave every source of medical opinion evidence, as well as testimonial evidence, either "limited," "partial," or "little" weight. (*Id*. at 28-29). Plaintiff's testimony was the first to be rejected. (*Id*. at 25-27). The ALJ found Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms to be "not entirely credible." (*Id*. at 25). The ALJ then explicitly understated Plaintiff's BMI by about 20%, incorrectly claiming that it only ranged from 51.26 to 56.77. (*Id*. at 26). As discussed above, between 2013 and 2015, Plaintiff's BMI was measured as

ranging between 61.27 and 66.27. (*Id*. at 533-34, 524-25, 530). While it is logically unrelated to Plaintiff's credibility regarding the intensity and persistence of her symptoms, the ALJ also inexplicably and incorrectly faulted Plaintiff for not having yet undergone knee replacement surgeries (which was partially medically unfeasible due to her age) as well as bariatric weight-loss surgery (for which she lacked financial resources). (*Id*. at 27). The ALJ found, again without any significant explanation, that Plaintiff's few daily activities (going to the bathroom by herself, combing her daughter's hair, and heating microwavable foods) somehow casts doubt on the remainder of her testimony. (*Id*.). Likewise, the ALJ rejected Ms. Hurley's testimony about the severity and limiting effects of Plaintiff's symptoms because "she is not an acceptable medical source," and because "her statements essentially mirror the claimant's allegation." (*Id*. at 29). The court finds that the ALJ's reasoning for rejecting the testimonial evidence in this case was not based on substantial evidence in the record. That Ms. Hurley was not "an acceptable medical source" is irrelevant as her testimony did not venture to render any medical opinions; instead, Ms. Hurley merely related her own observations concerning Plaintiff's daily activities. Further, in light of the summary of the testimonial evidence discussed above, it was error for the ALJ to conclude that Ms. Hurley's testimony "essentially mirror[ed]" Plaintiff's allegations. While these two sources of testimonial evidence were in harmony with one another, they did not "mirror" one another.

The ALJ's reasoning for rejecting the functioning opinion of Plaintiff's treating physician, Dr. Roback, is equally unclear and unconvincing. (*Id*. at 28). The ALJ incorrectly surmised that Dr. Roback's opinions regarding Plaintiff's limitations were based only on Plaintiff's spinal impairments, for which the ALJ stated that Plaintiff received "very little treatment." (*Id*. at 28). Dr. Roback's opinion (rendered in 2013 and again in 2015) regarding Plaintiff's functional limitations was clearly related more to her obesity and knee problems than any other impairment. (*See id*. at 471, 529-34). The ALJ also based the rejection of Dr. Roback's opinion on the notion that "medication reduces the claimant's pain so that she can sleep and complete household chores." (*Id*. at 28). Again, the court finds this to be an insufficient basis for rejecting the functioning limitations opinion of a treating physician with a longstanding doctor-patient relationship, and

whose opinion appears to be entirely consistent with medical and diagnostic evidence in the record.

The ALJ gave "partial" weight to the opinion of Dr. Coleman, a non-examining state agency physician; and "limited" weight to the opinion of Dr. Nguyen. (*Id*. at 28, 29). In October of 2013, without any consultative examination, Dr. Coleman inexplicably stated that, in his view, Plaintiff's complaints about her symptoms were only "partially credible," and that with the exception of a few minor differences, Dr. Coleman's assessment of her functioning capacity was the same as what was opined by Dr. Nguyen in 2012. (*Id*. 113-114). In December of 2012, Dr. Nguyen noted that "[t]he severity of her physical symptoms should be evaluated by the appropriate specialist" (*id*. at 82); and that a consultative examination would be required because "[t]he evidence as a whole, both medical and non-medical, is not sufficient to support a decision on the claim." (*Id*. at 84). Nevertheless, Dr. Nguyen concluded that Plaintiff could spend more than two hours a day carrying or lifting 20 pounds; that she could spend four hours carrying or lifting 10 pounds; that she could stand or walk for 6 hours per day; and that she could occasionally balance, stoop, kneel, crouch, and crawl. (*Id*. at 88-89).

The ALJ's decision contains no explanation as to why Dr. Coleman's opinion received "partial" weight, nor did the decision explain what might be the effect of giving this opinion "partial" weight; that is, it is not clear which part of Dr. Coleman's opinion was accepted and which part was rejected. Likewise, the ALJ afforded Dr. Nguyen's opinion "little" weight because "Dr. Nguyen did not consider the combination of her obesity and her right knee degenerative joint disease, which is the basis for limiting her to standing and walking two hours out of an eight-hour workday." (*Id*. at 29). Ironically, the ALJ's reason for rejecting Dr. Nguyen's opinion encompasses the ALJ's own error at Step Three. Nevertheless, the ALJ also did not venture to explain what might be the effect of giving "little" weight to this opinion. (*Id*.).

Thereafter, and proceeding on an unclear basis, the ALJ formulated a RFC that limited Plaintiff to sedentary work, with the exception that Plaintiff could frequently be expected to lift or carry 10 pounds, and up to 20 pounds occasionally; that she could sit for 6 hours per day; that she could occasionally climb ramps and stairs; and, most remarkably, that she could occasionally

19

balance, stoop, kneel, crouch, and crawl. (*Id*. at 25). While the ALJ's justification for this RFC was a series of conclusory statements about its reasonableness in light of the record (*see id*. at 29), the court finds that the RFC, as formulated, is not based on substantial evidence.

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant . . . [T]he Commissioner must provide clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician . . . [T]he opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons . . ." *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1222 (9th Cir. 2010) (quoting *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995). The reason that an ALJ must accord special weight to a treating physician's opinion is that a treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). If a treating source's opinions on the issues of the nature and severity of a claimant's impairments are well-supported by medically acceptable clinical and laboratory diagnostic techniques, and are not inconsistent with other substantial evidence in the case record, the ALJ must give it "controlling weight." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

If a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons. *Lester*, 81 F.3d at 830. However, if the treating physician's opinion is contradicted by another physician, such as an examining physician, the ALJ may reject the treating physician's opinion by providing specific, legitimate reasons, supported by substantial evidence in the record. *Id.* at 830-31; *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). Where a treating physician's opinion is contradicted by an examining professional's opinion, the Commissioner may resolve the conflict by relying on the examining physician's opinion if the examining physician's opinion is supported by different, independent clinical findings. *See Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995); *Orn*, 495 F.3d at 632; *see also Bayliss*, 427 F.3d at 1216 (if an examining physician's opinion is contradicted by another physician's opinion, an ALJ must provide specific and legitimate reasons to reject it). However, for present purposes, it is important to note that "[t]he

20

opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician" — such an opinion may serve as substantial evidence only when it is consistent with and supported by other independent evidence in the record. *Lester*, 81 F.3d at 830-31; *Morgan v. Comm'r of Soc. Sec.*, 169 F.3d 595, 600 (9th Cir. 1999). In this case, there is no other independent evidence in the record upon which the non-examining physicians' opinions are based.

Accordingly, the court finds that the ALJ erred in rejecting Dr. Roback's functioning limitation opinion because the ALJ failed to provide specific, legitimate reasons, supported by substantial evidence in the record, for doing so. Indeed, on this record it appears that the ALJ was required to give Dr. Roback's opinion controlling weight. As discussed above, the ALJ also improperly rejected Plaintiff's testimony, as well as that of Ms. Hurley, her housemate. Further, given that the non-examining physicians' opinions were only afforded "partial" and "little" weight respectively, it is unclear on what foundation the RFC was formulated. For that reason, as well as because the ALJ improperly discredited testimonial evidence and medical opinion evidence from Plaintiff's treating physician, the court finds that the RFC, as formulated by the ALJ, is not supported by substantial evidence in the record.

## CONCLUSION

For the reasons stated above, the court GRANTS Plaintiff's motion for summary judgment, DENIES Defendant's motion for summary judgment, and REMANDS this matter for further proceedings consistent with this order.

A separate judgment will issue.

**IT IS SO ORDERED.**

Dated: March 20, 2018.

ROBERT M ILLMAN
United States Magistrate Judge